UNITED STATES DISTRICT COURT **ORIGINAL**

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable KANDIS A. WESTMORE, Magistrate Judge

| | | |
|---|---|---|
| SONA NAJAFI, et al., | ) | **Motion for Preliminary** |
| | ) | **Injunction** |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | NO. C 19-05782 KAW |
| | ) | |
| MICHAEL R. POMPEO, et al., | ) | **Pages 1 - 32** |
| | ) | |
| Defendants. | ) | Oakland, California |
| _____ | ) | Thursday, December 5, 2019 |

<u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

APPEARANCES:

For Plaintiffs:            The Law Office of Rafael Ureña
                           925 N. La Brea, Fourth Floor
                           Los Angeles, California  90038
                  BY:  CURTIS L. MORRISON, ATTORNEY AT LAW

For Defendants:            DAVID L. ANDERSON, ESQ.
                           United States Attorney
                           450 Golden Gate Ave.
                           San Francisco, California  94102
                  BY:  KENNETH W. BRAKEBILL,
                       ASSISTANT UNITED STATES ATTORNEY

Reported By:        Raynee H. Mercado, CSR No. 8258

    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

```
 1    Thursday, December 5, 2019                          1:53 p.m.
 2                        P R O C E E D I N G S
 3              THE CLERK:  Calling case 19-5782, Najafi versus
 4    Pompeo.
 5                   (Pause in the proceedings.)
 6              THE CLERK:  Please state your appearances.
 7              MR. BRAKEBILL:  Hi.  Good afternoon, Your Honor.  Ken
 8    Brakebill for the United States.
 9              THE COURT:  Good afternoon, Mr. Brakebill.
10              MR. BRAKEBILL:  Thank you.
11              MR. MORRISON:  Good afternoon, Your Honor.  Curtis
12    Morrison for the plaintiffs.
13              THE COURT:  Good afternoon, Mr. Morrison.
14         All right.  We're here on the motion for preliminary
15    injunction.  And so I reviewed the submissions of the parties
16    and I just have few questions.
17         Mr. Brakebill, what is the status of the waiver
18    applications of the remaining beneficiary plaintiffs?  Have
19    any more applications been decided?
20              MR. BRAKEBILL:  Yeah, that's a good question.  As of
21    yesterday, there were 9 of the 25 beneficiary plaintiffs who
22    started in the case 11 weeks ago -- have had visa issues and
23    waivers granted, so that's approximately 36 percent of the
24    original beneficiary plaintiffs.
25         Those correspond to I -- think it's 11 of 25 plaintiffs,
```

1  so roughly 40 percent of the plaintiffs in the case.  And I

2  think the case started with 20 families.

3          **THE COURT:**  Hmm.

4          **MR. BRAKEBILL:**  And now 9 of 20 families are -- have

5  their issues resolved, so 45 percent.  So things are moving.

6          **THE COURT:**  So it's moving along.

7          **MR. BRAKEBILL:**  It is moving.

8          **THE COURT:**  Okay.

9      And, Mr. Morrison, with respect to the APA claim based on

10  unreasonable delay, what objective standard does PP 9645 have

11  as to timing?

12      Seems to me it doesn't have one, so I mean, that's why I'm

13  asking you the question.

14      And isn't it distinguishable from the *Nine Iraqi Allies*

15  case as the statute there required the applications to be

16  processed within nine months?  And we don't have anything like

17  that here.

18          **MR. MORRISON:**  Correct, Your Honor.

19      I would say that there two answers to that.  One is if you

20  look at the waiver application as part of the visa

21  application, then there -- there are guidelines that say

22  within 30 days or a spousal visa or 60 days for a fiance visa.

23  To be frank with the court, I haven't brought that up before.

24      But the thing that I -- I think is most dispositive is

25  when the defendants implemented PP 9645, the prong that

1  there's -- there's three criteria for a waiver.  And the

2  consular office has to term those first two before they send

3  it to the visa office to determine the national security.

4       The first two are undue hardship and national interest.

5  And because they're family members of U.S. citizens and legal

6  permanent residents, they always say the national interest.

7       And the undue hardship prong is the most interesting to

8  me, Your Honor, because the -- the requirement for that is the

9  consular officer has to seek -- has to determine that there's

10  an unusual situation exists that compels an immediate need to

11  travel and that delaying the visa issuance until after the

12  country restriction is lifted would defeat the purpose, so it

13  would be futile.

14       So if the criteria for issuing a waiver requires it to be

15  an immediate situation, then it's implied that the waiver

16  should happen at least swiftly -- maybe not immediately

17  because there is -- they have to do national security checks.

18  I understand that.

19       But what defendants are arguing now is they don't ever

20  have to, that it's completely discretionary.  And I think that

21  that's -- that's completely wrong.  If they issued internal

22  guidance that says something needs to be done quickly, then it

23  had -- that is law to apply.

24       The second point of evidence for that is they -- they say

25  that inquiries to the countries of concern, email address --

1   that's where the consular officer sends an email to the visa

2   office.  What that is is an actual waiver request.

3       See, the visa applicants do not make waiver requests

4   themselves.  The consular officer on their behalf say, oh,

5   this person equals for the first two prongs, so let's ask the

6   visa office for permission to give a waiver.

7       So when they send that email, the -- the State Department

8   has issued guidance and also we have emails where they've said

9   this, where they say responses to that can happen within one

10  business day.  So our argument is that if this is a process

11  that can be done within one business day, that it --

12          **THE COURT:**  I think that you're not answering my

13  question, though.

14          **MR. MORRISON:**  Okay.

15          **THE COURT:**  My question is really designed to get at

16  reviewability of the APA claim regarding the timing.  So you

17  have two APA claims.  One is about timing.

18          **MR. MORRISON:**  Right.

19          **THE COURT:**  And the other is about the process.

20          **MR. MORRISON:**  Right.

21          **THE COURT:**  Or the policy.

22      And so with respect to the APA claim that you've alleged

23  regarding timing, it's not clear to me that that's reviewable

24  because there doesn't appear to be any sort of objective

25  standard that's set forth in PP 9645 as to timing.

```
 1              MR. MORRISON:  Right.

 2              THE COURT:  Unlike the statute that was addressed in

 3    the Nine Iraqi Allies.

 4              MR. MORRISON:  Right.

 5              THE COURT:  So it may be that you failed to establish

 6    reviewability of that APA claim regarding timing.

 7              MR. MORRISON:  I -- I acknowledge that there is a --

 8    a quirk there.  And what I would say is that they've created

 9    an impossible situation, though, because it's clear that they

10    cannot withhold the visa because they have internal guidelines

11    that say they automatically and must.  And they argued before

12    the Supreme Court that this travel ban has like a -- well, for

13    the Ninth Circuit, they say it was robust.  Before Justice

14    Breyer they said yes, please consider this travel ban as if

15    the waiver -- the waiver provision applies.

16         So they have presented this travel ban as if it has a

17    legitimate waiver process, but if they withhold visas, there

18    has to be some reviewability somewhere there.

19              THE COURT:  Well, it sounds like they are reviewing

20    them, and they are issuing the waivers.

21         And so your claim is really about timing, and you're

22    wanting this court to impose a mandatory injunction requiring

23    the government to adjudicate these in 15 days.  And I just

24    don't know that there's --

25              MR. MORRISON:  Right --
```

1    **THE COURT:**  -- a basis for doing --

2    **MR. MORRISON:**  Two things there.  With respect to the

3    8 families who have been fortunate enough to have their visas

4    adjudicated, they're very grateful for that.  But that doesn't

5    mean much for the 12 that have been waiting, especially since

6    many of them have been waiting the entire 2 years --

7    **THE COURT:**  But the court has to decide the legal

8    question, though.

9    **MR. MORRISON:**  I understand.

10   **THE COURT:**  The court has to determine whether or not

11   your claim --

12   **MR. MORRISON:**  Right.

13   **THE COURT:**  I have to a lot at each claim.

14   **MR. MORRISON:**  Right.

15   **THE COURT:**  And then I have to decide if they're

16   reviewable.

17   **MR. MORRISON:**  Well --

18   **THE COURT:**  So there's sort of a threshold question

19   here that you're not getting me an answer to.

20   **MR. MORRISON:**  I would give a -- an alternative

21   option for the court.  If the -- the 14 days does not seem

22   reasonable because it is breaking new ground, I think that

23   some day a judge is going to have to say -- since the

24   proclamation left it ambiguous, some day a judge is going to

25   have to say, as they have said with other things like 485

1    adjusted statuses, they're going to have to say a amount of

2    time that's unreasonable.  And that's going to happen some

3    day.

4        So if the court's uncomfortable saying it has to happen

5    within 40 days.  The director of the visa office Edward

6    Ramotowski told Congress on September the 27th that the

7    backlog for the -- the waivers that had not been adjudicated

8    will be cleared out in the first three months of the year.

9        So at a bare minimum, I think it would be reasonable to

10   hold them accountable to that because I don't think it's going

11   to happen based on the statistics that have come out since.

12       I've submitted for the court September statistics, not yet

13   October statistics, that they just came out last weekend, and

14   there's no indication that they're going to clear the backlog

15   out by the first three months of the year.

16           **THE COURT:**  Um-hmm.

17       **MR. MORRISON:**  They're pacing something like 30 or 40

18   years, is how long this is going to take if they continue to

19   issue like a hundred more visas a month when they've got

20   17,000 in backlog.

21           **THE COURT:**  Okay.  So why don't we just separate

22   things out here.  And I'll go ahead and give Mr. Brakebill an

23   opportunity to respond to what's been said so far.  But I

24   really want to make sure we're talking about both APA claims

25   because there are two, and so the second one, you know, I'm --

1    **MR. BRAKEBILL:**  Excuse me.

2        **THE COURT:**  I'm finding is reviewable.  But the first

3    one does not appear to be reviewable.

4    So I'm happy to hear from Mr. --

5        **MR. BRAKEBILL:**  Sure.  Actually, I want to address --

6    I know there was a lot buried in the answer there and I'm not

7    going to respond to all.  But in your initial question that

8    you asked me for an update, I actually -- there's -- there is

9    other information that I think would be relevant to the court

10   because it does address in part what the two of you were

11   speaking about.

12   I did mention that nine of the 25 have actually been

13   issued visas.

14       **THE COURT:**  Right.

15       **MR. BRAKEBILL:**  There are actually 17 beneficiary

16   plaintiffs that remain in the case and of the 17 that now

17   remain, 5 of them are involved in the national security

18   vetting process, so that would be roughly 20 -- 29 percent of

19   those that remain are -- are in there.

20   So that's out to interagency review, and the defendants

21   are waiting for that response.  So, again, that is in process.

22       **THE COURT:**  Okay.

23       **MR. BRAKEBILL:**  And the defendants -- the consular

24   officer him or herself does not know what information is going

25   to come back.

1          With regards to the other 12 beneficiary plaintiffs whose

2     cases are still outstanding, as of yesterday, the defendants

3     were still waiting for information or documents from the

4     individual applicants.

5          **THE COURT:**  Oh, okay.

6          **MR. BRAKEBILL:**  So, again, further to our earlier

7     point, things are moving.  This is not a stalemate.  This is

8     not a stagnant process.  And, again, the defendants don't know

9     what information is going to be received in these documents,

10    what information is going to flow.  And even if that

11    information is to -- to come back, it's entirely speculative

12    that even if this court were to grant the requested relief,

13    that those -- any identify those 17 plaintiffs -- beneficiary

14    plaintiffs would be admitted into the United States.

15         So I did want to supplement with -- with those facts --

16         **THE COURT:**  Right.

17         **MR. BRAKEBILL:**  -- as well.

18         With regard to the -- there were two other points I wanted

19    to make.  One with regard to the APA claim, and another that

20    plaintiffs' counsel got into -- it seemed to be irreparable

21    harm -- irreparable harm point, and I'm happy to answer any

22    further questions upon that.  But I believe that's what

23    plaintiffs was -- was getting to.

24         **THE COURT:**  Right.

25         **MR. BRAKEBILL:**  The standard in the PP 9645 for undue

1    hardship is not the same to get a preliminary injunction,

2    which is -- it's a different standard for irreparable harm.

3        So I just wanted to point that out.  The standard is

4    the -- it's a high -- high burden for the plaintiffs.  The

5    plaintiffs must show that there is an extreme or a very

6    serious damage will result if the preliminary injunction

7    requested is not entered.

8        And, again, further to the point that I just made, the

9    defendants don't know.  There is no guarantee that of those 17

10   beneficiary plaintiffs, what information is going to come back

11   and whether or not, even if there is an order in 15 days, or

12   even a year, what's going to happen.

13       So the -- in terms of the irreparable harm standard, it's

14   very possible that the family separation, any trauma

15   associated with that, may very well continue even if there is

16   an order that's entered.

17       In terms of the APA claim, I wanted to make sure I'm

18   addressing your question.  So if you don't mind, what was the

19   specific question that you had on the -- on the -- I think --

20           **THE COURT:**  Oh, whether it was reviewable.

21       And then the second claim, I mean, really I just wanted

22   to -- I don't have a question about that one being --

23           **MR. BRAKEBILL:**  Okay.

24           **THE COURT:**  -- reviewable.  But --

25           **MR. BRAKEBILL:**  Well, I think --

1    **THE COURT:**  Yeah.

2    **MR. BRAKEBILL:**  -- if I could, in preparation for

3    this, I went back to look at the plaintiffs' complaint --

4    **THE COURT:**  Okay.

5    **MR. BRAKEBILL:**  -- which is the operative document.

6    And if you look at their allegations, as opposed to

7    language that's in the briefs, there are two specific

8    allegations in terms of policies, policies and procedures.

9    **THE COURT:**  Right.

10   **MR. BRAKEBILL:**  The first one that you mentioned goes

11   to unreasonable delay.

12   **THE COURT:**  Right.

13   **MR. BRAKEBILL:**  And defendants agree with what Your

14   Honor was suggesting that there is no objective standard in

15   PP 9645 for how quickly waiver adjudications must be

16   completed.

17   And there is a number -- there are a number of cases -- a

18   lot of case law that defendants have cited in their brief that

19   get to the point that I think you are -- you are getting to,

20   which is even in the context of other immigration cases, cases

21   that had pending for as long as 40 years, have been deemed to

22   be not unreasonable.

23   So -- so with regard to those specific allegations,

24   defendants do agree that -- that there would not be a -- a

25   cause of action, nor would there be any judicial review.

1          And in terms of that allegation, just to kind of finish

2     this off, the allegation in the complaint is a -- is a pattern

3     and policy of unreasonable delay.  It's not of not following

4     their own guidelines.

5               **THE COURT:**  Right.

6               **MR. BRAKEBILL:**  That's -- that's not the case.

7          And the reason why I bring that up is in the plaintiffs'

8     reply brief, they cited *Emami*, for example, which is a

9     different set of factual allegations where the actions were

10    that there were blanket denials.  Very different from the case

11    that we have here just based on the facts that I been -- I've

12    been relating.

13         But in terms have whether or not there's review on that,

14    again, it's not an *Accardi* situation, because there is no

15    allegation that the defendants are not complying with the

16    guidance, their own guidance.  It's unreasonable delay.

17         If terms of the other -- the other allegation that --

18    that's in their complaint I think gets at -- at your point,

19    which is the second type of APA claim.  And that is what the

20    plaintiffs alleges is a problem in terms of how the defendants

21    are implementing PP 9645.

22         And, specifically, what plaintiffs allege -- and, again,

23    in their complaint -- is that -- is that the consular officer

24    is given authority under PP 9645, but, again, in the

25    plaintiffs' words, defendants have usurped that consular

1     authority by enabling the consular officers to consult with

2     other State Department officials, supervisors, managers,

3     et cetera.

4           **THE COURT:**  Okay.

5           **MR. BRAKEBILL:**  And defendant's position is that

6     there is no claim there based on that limited allegation for

7     several reasons.  And this is why they would not prevail.

8           First of all, they cannot point to a source of law, any --

9     any source of law that says that a consular officer cannot

10    consult with another supervisor, or consular official in the

11    State Department in order to make his or her -- his or her

12    decision.

13          Secondly, PP 9645 in and of itself does not define what a

14    consular officer is or means.  In fact, the only data or

15    information we have on that is to look to federal law.  And if

16    you look at federal law, it's 8 USC 1101A9, a -- a regional

17    rank-and-file consular officer consulting with a supervisor or

18    manager on issues such as national security is totally within

19    the realm of how federal law defines consular officer.

20          And then, third, it just makes sense.  The individual

21    rank-and-file consular officers don't have access to any of

22    the intelligence, national security information.

23          **THE COURT:**  Um-hmm.

24          **MR. BRAKEBILL:**  And it -- it makes sense that if the

25    consular officer is going to make a decision that's consistent

1   with the goals of PP 9645, which is -- which is to make sure

2   that those who are admitted into the United States do not pose

3   a national security risk or a risk to public welfare, that he

4   or she should be able to consult with people who are closer to

5   that -- to that process.

6       And in addition, I would just note plaintiffs did file

7   well over a hundred exhibits with their motion.  And if you

8   look at -- I just found one earlier, Exhibit 9-89, where an

9   official in the State Department wrote to a congressman --

10  congressman who's the head of the subcommittee on foreign

11  affairs acknowledging that individual consular officers do

12  consult with other supervisors and managers.

13      But it's to -- again, to quote the document, to facilitate

14  uniform implementation.  So, again, we believe as a -- as a

15  matter of law, there -- there is no claim there.

16      In terms of -- in terms of whether or not as a matter of

17  law, there can be judicial scrutiny for this, I -- I'm happy

18  to talk further about the cases, but I would refer Your Honor

19  to -- specifically the car- -- our analysis of the *Carmel* and

20  *W. Watersheds* case, which this case in particular is not like

21  those cases.

22      And notwithstanding our analysis in our opposition brief,

23  the plaintiffs failed to address the -- the differences.  And

24  those differences make a real difference here, and that's why

25  there should not be judicial scrutiny of the claim that you're

1  talking about.

2      In those two cases, unlike our case, it -- actually, let

3  me step back to -- to explain it.  *Carmel* and *W. Watershed*

4  don't stand for the proposition that just because a

5  presidential proclamation -- the authority to -- to execute

6  one --

7          **THE COURT:**  Um-hmm.

8          **MR. BRAKEBILL:**  The fact that it has an authorizing

9  or enabling statute is not by itself sufficient to compel

10  judicial review or judicial scrutiny.

11      If you look beyond the blanket statement of those cases

12  and look at the very specific executive orders in those cases

13  and look at the enabling statutes in those two cases, our case

14  is very different from those two cases.

15      What was -- what was most important in those -- in those

16  cases was the fact that -- well, there were a number of things

17  that were important, but -- but of primary importance was that

18  there was a law to apply.  There was a law to apply.  There

19  were objective standards in the law --

20          **THE COURT:**  Um-hmm.

21          **MR. BRAKEBILL:**  -- that a court could then look to in

22  order to interpret the underlying actions.

23      In those two cases, also, unlike here, the -- the

24  executive orders did not -- did not address -- they were

25  silent on whether or not there was a privately enforceable

1  right of action, unlike here where the PP 9645 has a specific

2  provision that we've cited in our brief that actually says

3  there shall not be any -- any private right of action.

4      And then, finally, you have to look at setting aside the

5  fact that those executive orders were much more specific than

6  PP 9645.  And I am happy to delve into that further.

7          **THE COURT:**  It appeared to me, though, that there

8  were objective standards as to who has the discretion and

9  authority to adjudicate waivers.

10         **MR. BRAKEBILL:**  There are -- there are not objective

11 standards as to how that consular officer is to apply the

12 standards.  There was a general three-part test that PP 9645

13 identified.  And beyond that, it was silent.  It left it to

14 the subjective determination of a consular officer as to how

15 to apply those standards in each particular case.

16     And so that's how this case difference (sic) -- and other

17 ways from *W. Watershed* and from *Carmel*.

18     And in -- and, finally, the authorizing statute in this

19 case is different from any authorizing statute in those cases.

20     Here, there actually is a -- 1182(f) which is the enabling

21 provision for the President to have enacted PP 9645, actually

22 empowers the President to suspend entry of an entire class

23 of -- of immigrants if it's in the national interest.  So

24 it's -- it's a different type of enabling statute here than it

25 was in those two cases.

1    So if you look at all of those things combined, the

2   defendant's position is that the factual circumstances are

3   much different, and they do not compel judicial scrutiny here.

4         THE COURT:  Okay.  I don't know that I agree with

5   that, but okay.  I appreciate your argument.

6     Anything more -- anything from the plaintiff on that --

7         MR. MORRISON:  Yes --

8         THE COURT:  -- particular topic.

9         MR. MORRISON:  -- Your Honor, if I may.  When you say

10   "that particular topic" you --

11              (Simultaneous colloquy.)

12              (Off-the-record discussion.)

13         THE COURT:  On the unreasonable delay claim, I don't

14   believe you have met your burden.

15         MR. MORRISON:  Okay.  Thank you.

16         THE COURT:  On the reviewability of the remaining

17   claim about the policy -- the alleged policy of depriving

18   consular officers of their discretion to issue waivers --

19         MR. MORRISON:  I --

20         THE COURT:  -- that's what was just being discussed.

21     And if you'd like to respond to the arguments just made by

22   defendant -- defendants, go ahead.

23         MR. MORRISON:  Thank you, Your Honor.  I very much

24   do.

25     Okay.  The -- the defendants introduced an argument today

1   about the definition of a consular officer, and they pointed

2   to 8 U.S. Code 1101.  And I realized he wasn't reading it, so

3   he's misrepresented it a little bit.  And I just want -- it's

4   just one sentence I just want to read.

5       The term consular officer means any consular diplometic

6   (phonetic) or -- diplomatic or other officer or employee of

7   the United States designated under regulations prescribed

8   under authority contained in the chapter for the purpose of

9   issuing visas.

10      There are two words there that are key.  One is "employ"

11  and one is "designated."  The reason "employ" is key is

12  because we've introduced evidence -- actually not on this

13  motion, but on the motion for expedited discovery -- that

14  contractors are making the decisions on the national security

15  prong with Quality Support, Inc., so they're not employees of

16  United States because they're contractors.

17      The second thing on the word "designated" under

18  regulations prescribed, well, it turns out the CFR embellishes

19  that and says what that means.

20      And the CF -- CFR -- it's -- I'm sorry -- 22 CFR Section

21  40.1.

22          **THE COURT:**  Um-hmm.

23          **MR. MORRISON:**  There are two different kinds of

24  consular officers.  One is a commissioned consular officer.

25  And one is one that is designated by the deputy assistant

1   secretary.  And that process requires certification.  That

2   process requires training.  There must be -- the examiners

3   have to be qualified by knowledge and experience to perform

4   the functions.

5       So to say that everyone's a consular officer betrays the

6   law because you either are a consular officer or you are not a

7   consular officer.  And the CFR's have made it clear who is and

8   who isn't.  And the people that are in DC are -- that are

9   working with the contractor Quality Support, Inc. that are

10  determining the national security and safety prong of the

11  three-prong waiver are not consular officers.

12      So that's the one point I want to make.

13              **THE COURT:**  Okay.

14          **MR. MORRISON:**  The second point I wanted to make when

15  you were talking about is there clear law to apply and -- and

16  he says no, they just -- they just said that there are these

17  three prongs, and they didn't say anything beyond that.

18  That's not accurate.

19      The -- the first prong, undue hardship, as I mentioned

20  before, has very specific requirement (sic) on whether or not

21  there's an immediate need to travel and whether it would be

22  futile if that didn't happen.

23      The second prong, the national interest prong, is

24  automatically satisfied if it's in the interest of --

25  basically they -- they have done regulations -- they have

1    promulgated guidance on each of these.  They haven't just left

2    it to consular officer at the -- and that's cited -- it's --

3    it's maybe in six places in -- in the exhibits that we've

4    attached to the motion for preliminary injunction and cited in

5    the briefing.

6        The other -- actually, this is the -- the most important

7    thing.  Defendants have used the word "consult" like there's

8    nothing that says that consular officers can't consult on

9    national security concerns.  And I agree with that a hundred

10   percent.  There's nothing that says that.  And I think that

11   they should, and it's a wonderful thing if they do.

12       The problem is they don't have the discretion to make the

13   decision.  And that's what the President gave them in Section

14   3(c) of PP 9645.  We've got two exhibits to the motion for

15   preliminary injunction from consular officers that say that

16   that's the case.  We have no evidence submitted by defendants

17   that say that it's not the case.

18       We have lots of other exhibits that -- where defendants

19   are not keeping it a secret that they have usurped this

20   authority.

21       And then there's the most recent -- where I've tried to

22   introduce to the court, but I may have not done it correctly.

23   The Nantais declaration, which is a declaration by Joel D.

24   Nantais, one of the defendants in this matter, and another

25   case, the *Emami* case before the district (sic) of

1  San Francisco where he has said that there is a safety feature

2  in the software that actually prevents the consular officer

3  from approving the waiver until the national security prong is

4  approved by the visa office.

5      So I feel -- I appreciate that the -- Your Honor

6  recognizes the substance of the arbitrary and capricious APA

7  claim.

8          **THE COURT:**  Right.  It appears to me that there is

9  enough that the court would have the ability to review that

10  APA claim to the extent that the plaintiff is making a claim

11  that the discretion of the consular officer's discretion and

12  authority to make individual waiver decisions is being

13  unlawfully usurped.  That is reviewable, in my view, under the

14  APA.  And I've heard the arguments to the contrary, and I

15  disagree.

16      Now, whether or not you'll prevail, that's another

17  question.  But certainly as to reviewability, I believe that

18  claim is reviewable.

19      One of the other questions that I have to ask tied to that

20  issue is how does that policy connect to the unreasonable

21  delay?  Because you seem to be conflating --

22          **MR. MORRISON:**  Yes.

23          **THE COURT:**  -- those things.  And so I wasn't --

24          **MR. MORRISON:**  They --

25          **THE COURT:**  -- quite clear.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1          **MR. MORRISON:**  Thank you, Your Honor.

2          They are connected.  You can see in the plaintiffs'

3    declarations that when the plaintiffs describe what happened

4    at the consular office interview, repeatedly, this is the same

5    scenario.  The consular officer says, I wish I could give you

6    a visa, but because of this proclamation, I can't.  And it's

7    out of my hands.  It's up to the visa office, so that is the

8    source of the delay.

9          Consular officers themselves would love to issue visas,

10   like they do for the other hundred and ninety nationalities

11   across the country.  There's just Iran and a few other

12   countries we're singling out right now.

13         And I think history will show this is like a Chinese

14   Exclusion Act, and it's -- I'm sorry.  That's a tangent.

15         The -- it's -- it's tied because that's the source.

16   That's what's causing unreasonable delay.  If you didn't have

17   this usurpation of authority, I think the consular officers

18   would make prudent decisions that they're trained to do, that

19   they're knowledgeable, that they will make good decisions to

20   either admit or deny entry of visa applicants.

21         **MR. BRAKEBILL:**  Your Honor, if I might, could I

22   respond?

23         **THE COURT:**  Yes.

24               (Simultaneous colloquy.)

25         **MR. BRAKEBILL:**  I just want to say the evidence in

1  the record for purposes of this motion belies that.  As I --

2  as I mentioned with the status of the remaining beneficiary

3  plaintiffs, as well as the -- the beneficiary plaintiffs whose

4  visas have already been granted, but specifically, there are

5  12 or 71 percent of the remaining beneficiaries in this case.

6      Defendants are waiting on information from them.

7          **MR. MORRISON:**  I would just ask for an offer of proof

8  of that.  That's not -- actually, we did agree on some of

9  those numbers in our discovery dispute letter that we've

10  submitted to Your Honor.

11      And -- and the defendants were waiting on information from

12  two plaintiffs.  That information's been provided by both, and

13  now we're -- we don't know what's -- the hold-up is, which

14  is -- I don't know if you wanted to discuss the discovery

15  dispute, but --

16          **THE COURT:**  No, I don't.  I don't --

17          **MR. MORRISON:**  Sorry.

18          **THE COURT:**  -- discovery dispute.

19      I'm just still not really clear what evidence there is

20  that this alleged policy that you're complaining of causes the

21  delay.

22      It appears to be that there was an automated system that

23  was implemented this year?

24          **MR. MORRISON:**  Yes, Your Honor, early July.

25          **THE COURT:**  Yeah.  In early July, so that's

1    suggesting some improvement possibility.  So, you know, I have

2    no way of knowing exactly what is causing the delay and if

3    this alleged usurpation that you're describing is the cause of

4    the delay versus something else.

5              **MR. MORRISON:**  Right.

6              **THE COURT:**  That's what is not clear to me in the

7    evidence.

8              **MR. MORRISON:**  And -- and the evidence, most of which

9    just came from the *Emami* case, are from the FOIA reading room

10   for the State Department, to be honest.

11       The -- the FAM (phonetic) guidance, everything is redacted

12   with respect to the national security and public safety prong.

13       So you are correct, we're not bringing a full picture to

14   the court on that question because we don't have it, and that

15   gets into the discovery issue a little bit.

16             **THE COURT:**  Okay.

17       All right.  Anything further from you, the government?

18             **MR. BRAKEBILL:**  No, I was just -- I was just going to

19   point out, as Your Honor's talking about evidence, with

20   regards to things moving in the -- there was an October 3rd,

21   2019 meeting between the Department of State and the AILA, and

22   that's cited in our brief.  And this gets to the -- the new

23   vetting system that was implemented in July of 2019.

24       In the minutes of that meeting that followed up, so

25   roughly two months ago, the State Department noted that within

1     six months, which would be another four months from now, the

2     expectation is that a majority of the pre-July 2019 cases,

3     which is the entirety of the beneficiary plaintiffs in this

4     case, the waiver adjudications would -- would be complete.

5              **THE COURT:**  Within six months.

6              **MR. BRAKEBILL:**  Within six months, yes.  That was the

7     expectation.

8              **THE COURT:**  Right.

9              **MR. BRAKEBILL:**  And I think the reason why plaintiffs

10    haven't come with any evidence is because the evidence is that

11    this is a process that's working.  It's happening.  And the

12    evidence that they submitted with all their exhibits, U.S.

13    congressman, senators commented, commented on the fact that

14    it's a lengthy process, it's a time-consuming process.

15        I recall that -- I can find the exhibit number, but

16    Senator Cory Bookers' office wrote an email to one of the

17    plaintiffs in this case acknowledging that it was a

18    time-consuming process.  There's a waiver that -- that there's

19    a mandatory and national security process that cannot be

20    expedited.

21        So that combined with the fact that this thing is moving.

22    And, again, we're only 20-plus months out of the proclamation

23    having been implemented itself.  Systems have to be -- you

24    know, there are a lot of systems in place to make this work.

25        The evidence is that this is -- this is moving and it's

working and, therefore, the defendant's position is that it
should run its course and that the adjudications will be
completed, as they are being completed as we speak.

    **MR. MORRISON:**  If I may, Your Honor?

    **THE COURT:**  Yes.

    **MR. MORRISON:**  Okay.

    Defendants said 20-plus months.  It's 24 months as of
Saturday that -- the proclamation has been into effect.  And
those 24 months may not seem as much to us, but it means a lot
to those families because that's time they will never get
back.

    The -- the second point I wanted to make, he brings --
defendants bring up the AILA liaison committee meeting that
happened in October.  And I am glad that he brought that up.
I saw that he cited it in his brief because when I filed the
motion, I entered the last two committee meetings.  And they
have interesting information.

    They have how many visas were in the backlog.  One of them
said 12,000 in 2018.  And then in April, they said -- one said
17,000.  And then most recently, the one that he referenced --
I'm sorry -- defendants referenced says that there's no way
they can tell.  And I thought, well, that's curious.  Why did
they do that?

    And then last week when the Nantais declaration came to my
attention, which was made in September --

1          **THE COURT:**  Um-hmm.

2          **MR. MORRISON:**  -- Joel Nantais, a defendant in this

3     action, actually confessed that there's no way for them to

4     know information about waiver requests because they did not

5     put that in their computer system for visas.  They are doing

6     that in a separate -- they're doing it via emails, so if you

7     want a waiver request -- if you're a consular officer, you

8     want a waiver for your client, you send an email.  You don't

9     do anything -- there's no field in the CI computer system.

10         So these numbers that they have estimated in the past on

11    how many people are in the backlog, when they said 12,000 or

12    17,000 or 15,000 before Congress, they have made those numbers

13    up.

14         And -- and I bring that up because I think we should be

15    skeptical when they say, oh, we're going to get these

16    completed in three months because they've not been forthcoming

17    in other issues surrounding the waiver.

18         **THE COURT:**  Hmm.

19         **MR. MORRISON:**  And that's one example.

20         And -- plus the fact that the issuance statistics do not

21    reflect an aggressive push to adjudicate waivers.

22         **THE COURT:**  Okay.

23         **MR. BRAKEBILL:**  Your Honor, sorry, just two things.

24         **THE COURT:**  Sure.

25         **MR. BRAKEBILL:**  One is that's a very serious

1    allegation plaintiffs' counsel just made because those numbers
2    were included in a report from the State Department to
3    Congress.  And the defendants vehemently, vehemently deny that
4    allegation that plaintiffs' counsel just made.

5        This is the subject of an ex parte motion that the
6    plaintiff just filed.  And if Your Honor would like us to
7    brief the significance of this Nantais declaration that was
8    filed in the *Emami* case -- again, it has --

9            **THE COURT:**  I --

10           **MR. BRAKEBILL:**  -- completely different allegations.
11   We'd be happy to do so.

12           **THE COURT:**  I don't.  And I was going to say that
13   the -- sort of last-minute request that I consider some
14   declaration that was filed in another case -- you know, in
15   that case, I guess, that's before Judge Donato, that's not
16   something the court is considering.

17           **MR. BRAKEBILL:**  And the only reason why I bring this
18   up, Your Honor, is because the defendants would just want a
19   chance to respond to the argument that plaintiffs' counsel is
20   making now on evidence that's not in the record --

21           **THE COURT:**  No, I'm not including that declaration in
22   the record.

23           **MR. BRAKEBILL:**  And the only one more statistic that
24   I can will -- 'cause it is related to what we just said and
25   what counsel just said, and it flows from that October 2019

1    report, that in the first 20 months that PP 9645 was in

2    existence from December through June 30, 2019, 3800 waivers

3    were granted and visas issued.

4        In the following roughly two and a half months, 11 -- 11

5    weeks, that number doubled to 7600.  And, again, this is after

6    the vetting -- the new vetting system came in in July, the

7    point being, again, not to beat a dead horse, but this -- this

8    is -- this is where this process is working, and any

9    allegation that the defendants are sitting on this or issuing

10   blanket denials, which, again, is not part of the complaint,

11   but any suggestion to the contrary is -- is inaccurate.

12       **THE COURT:**  Right.

13       So it sounds like the government is not seriously

14   making -- taking the position that the waivers don't have to

15   be adjudicated at all.

16       **MR. BRAKEBILL:**  No, the defendants are making very

17   diligent efforts to actually review these.  And --

18       **THE COURT:**  Okay.

19       **MR. BRAKEBILL:**  -- and it is a lengthy process, as I

20   mentioned.  There's plenty of evidence in the record.  It's

21   not a litigation position that the defendants are taking.

22   It -- it is true -- there's plenty of contemporaneous evidence

23   in the record that -- that supports this.

24       And ultimately, again, the national security process is

25   not just to do a national security process and delay this.

1   The point is to be consistent with the whole purpose and goal

2   of PP 9645, which was only to admit those that actually are

3   not -- a threat to national security and public safety.

4        And ultimately, it is the consular officer who is making

5   the decision.  And if the consular officer again is consulting

6   with supervisor or other consular officials in order to get --

7   to get that information, defendants believe that is entirely

8   consistent with federal law, and it's -- and it's --

9            **THE COURT:**  Okay.

10       Those were my only questions.  Anything further, then?

11   Submitted?

12           **MR. MORRISON:**  I would just want to say that two of

13   my plaintiffs did make it in -- into court today.  And Marzieh

14   Mirboni (phonetic) goes to UC -- University of California

15   Berkeley for civil engineering.  And her husband -- she's

16   trying to get him here after applying for him for five years.

17   And it's been a -- an incredible burden on her family.

18       And also Kia Nasseri is here today, who's trying to get

19   his 19-year-old stepdaughter -- he petitioned for her when she

20   was 17.  And that's the family that -- they're actually moving

21   her from country to country as to be lawful and not overstay

22   any visitor visa because she cannot go back to Iran because

23   her father is abusive.  And that -- there's just incredible

24   hardship there with respect to that.  And that's the only

25   thing.

1     **THE COURT:**  And the court acknowledges that and does

2   not minimize the suffering --

3     **MR. MORRISON:**  Thank you.

4     **THE COURT:**  -- that continues.

5       Anything further?

6       Okay.  Thank you.

7     **MR. BRAKEBILL:**  Thank you.

8     **MR. MORRISON:**  Thank you.

9       (Proceedings were concluded at 2:36 P.M.)

10                    --o0o--

11

12

13                **CERTIFICATE OF REPORTER**

14

15       I certify that the foregoing is a correct transcript

16   from the record of proceedings in the above-entitled matter.

17   I further certify that I am neither counsel for, related to,

18   nor employed by any of the parties to the action in which this

19   hearing was taken, and further that I am not financially nor

20   otherwise interested in the outcome of the action.

21

22   _____

23   Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

24             Tuesday, December 17, 2019

25

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*